UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JACKIE W. NASH )
)
V. ) NO. 2:08-CV-185
)
MICHAEL J. ASTRUE, )
Commissioner of Social )
Security )

REPORT AND RECOMMENDATION

Plaintiff has filed this action for judicial review of the denial of his applications for disability insurance benefits and supplemental security income under the Social Security Act. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 6 and 13].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988).

Plaintiff was 42 years of age at the time of the denial of his applications in a hearing decision issued by the Administrative Law Judge ["ALJ"]. He has past relevant work experience as a saw operator, laborer, material handler, machine operator, line operator, and forklift operator. All of these occupations were medium to heavy exertionally. The job of forklift operator is classified as semi-skilled while the remaining jobs were unskilled. He has a high school education. He alleged an onset of disability on September 9, 2005 as a result of a heart attack. Plaintiff asserts that he is disabled due to his heart condition (Tr. 114), but also asserts that he has suffered strokes and has diabetes.

Plaintiff's medical history is summarized in his memorandum in support of his motion as follows:

> Plaintiff was admitted to Bristol Regional Medical Center from September 9, 2005 through September 12, 2005, after he presented with a one week history of left anterior pressure type chest pain with radiation into his back, as well as intermittent left arm pain. Plaintiff was found to be suffering from an acute inferior wall myocardial infarction, for which he underwent left heart catheterization with left ventriculogram, as well as placement of a temporary pacemaker, with subsequent percutaneous coronary intervention with implantation of a drug-eluting stent to the right coronary artery. The final diagnoses upon discharge were inferior wall myocardial infarction, bradycardia, cardiogenic shock, hypokalemia, hypertriglyceridemia, and diabetes mellitus (Tr. 191-212, 232-253).
>
> Plaintiff received Emergency Room treatment at Bristol Regional Medical Center on September 14, 2005 and December 8, 2005, due to complaints of flank pain, cold symptoms, body aches, and fatigue. The diagnoses were pneumonia, viral syndrome, mild bronchitis, and otitis media (Tr. 216-231).
>
> Plaintiff was again admitted to Bristol Regional Medical Center from December 24, 2005 through December 28, 2005, after he developed an onset of substernal chest discomfort. EKG in the Emergency Room was consistent with an acute inferior wall myocardial infarction. On December 24, 2005, in the cardiac catheterization lab, Plaintiff was found to have a totally occluded right coronary artery which was opened successfully. After the catheterization, Plaintiff began having diplopia, slurred speech, and right-sided weakness, thus neurology consultation was obtained. Dr. Wilson impression was left hemisphere

cerebral infarction, cannot rule out a brainstem event; diplopia, again, cannot rule out brainstem even, question medication effect; heart disease with previous myocardial infarction, stent and revision earlier today; elevated cholesterol; and diabetes. Subsequent head CT yielded the impression of multiple areas of vascular atresia including the left A1 segment, the distal left basilar supplying the left posterior cerebral, and the entire right vertebral artery. Consultation by Dr. Amin was also obtained, due to uncontrolled diabetes. Review of systems was positive for shortness of breath with exertion, chronic left shoulder pain, and depression. Dr. Amin's impression was diabetes mellitus, type II, uncontrolled secondary to noncompliance with diet and medications due to inability to purchase medication; acute MI secondary to thrombosed arterial stent; left CVA; hyperlipidemia; and tobacco abuse. The final diagnoses upon discharge were acute inferior wall myocardial infarction, left hemisphere cerebral infarction, hypercholesterolemia, and diabetes (Tr. 254-327).

Plaintiff received treatment at Twin City Medical Center from September 19, 2005 through April 12, 2006. Conditions and complaints addressed during this time include blurred vision, decreased left ear hearing, muscle pains in the hands and shoulders, anxiety, seasonal allergies, coronary artery disease, diabetes mellitus, history of CVA and brain stem stroke, smoking cessation, hypertension, right leg weakness, leg pain, and dental pain (Tr. 330-342).

Admission to Bristol Regional Medical Center was again required from May 27, 2006 through May 29, 2006, after Plaintiff presented with a two hour history of anterior chest pain which he described as an aching or pressure sensation. In the Emergency Room, EKG was felt to be consistent with an acute inferior wall myocardial infarction, manifested by increased ST segment elevation in the inferior leads and reciprocal changes in I and aVL. Previous EKGs were noted to have shown slight ST elevation with Q-waves inferiorly. On May 27, 2006, left heart catheterization was performed emergently with a c/5 x 20 mm TAXUS stent inserted into the right coronary artery and proximal mid portion with good results. The discharge diagnoses were acute inferior wall myocardial infarction, reocclusion of the right coronary artery; status post PCI to the right coronary artery in September of 2005 and December of 2005; previous evidence of cerebellar pontine cerebrovascular accident; diabetes mellitus; hyperlipidemia; and tobacco abuse (Tr. 348-372).

Plaintiff underwent consultative exam by Dr. Karl W. Konrad on May 31, 2006. Presenting complaints included history of three myocardial infarctions, poorly controlled diabetes, history of stroke affecting the right side, right leg tiring easily, problems writing with the right dominant hand, decreased vision, slurred speech at times, and decreased taste. Exam was remarkable for absent right femoral pulse, absent bilateral pedal pulses, hepatomegaly, and petechiae of the right dorsal forearm. The diagnoses were coronary artery disease, diabetes, hepatomegaly, petechiae, and decreased right leg arterial circulation. Dr. Konrad opined Plaintiff can lift/carry a maximum of 40 pounds occasionally, 25 pounds frequently; can stand and/or walk (with frequent breaks) for a total of six hours in an eight-hour workday; and can sit (with normal breaks) for a total of six hours in an eight-hour workday (Tr. 373-379).

Plaintiff has received follow-up followed care by Dr. Wilson, of Mountain Empire Neurological Associates (Tr. 346-347, 380-390). On February 24, 2006, Dr. Wilson reported evaluating and caring for Plaintiff during his hospitalization of December 2005, due to an acute left hemisphere stroke. Dr. Wilson reported that Plaintiff still has a right-

3

sided weakness in addition to diabetes with diabetic neuropathy and a previous myocardial infarction. Dr. Wilson opined Plaintiff is unable to function in any gainful employment (Tr. 388).

On July 10, 2006, a reviewing state agency physician opined Plaintiff can lift/carry a maximum of 20 pounds occasionally, ten pounds frequently; can stand/walk (with normal breaks) for a total of about six hours in an eight-hour workday; can sit (with normal breaks) for a total of about six hours in an eight-hour workday; can occasionally (less than one-third of the time) climb ladder/rope/scaffolds; and can frequently (less than two-thirds of the time) balance, stoop, kneel, crouch, crawl, and/or climb ramp/stairs (Tr. 391-399).

Also on July 10, 2006, a second reviewing state agency physician opined Plaintiff can lift/carry a maximum of 20 pounds occasionally, ten pounds frequently; can stand/walk (with normal breaks) for a total of about six hours in an eight-hour workday; can sit (with normal breaks) for a total of about six hours in an eight-hour workday; can never climb ladders, ropes, or scaffolds; can occasionally (less than one-third of the time) balance and/or climb ramp/stairs; can frequently (less than two-thirds of the time) stoop, kneel, crouch, and/or crawl; and must avoid concentrated exposure to dangerous machinery and unprotected heights. Dr. Smith opined that Dr. Konrad's assessment of lifting/carrying 40 pounds occasionally and 25 pounds frequently is somewhat inconsistent with the overall evidence which would support a more restrictive assessment (Tr. 400-407).

Dr. Benjamin S. Scharfstein treated Plaintiff from June 19, 2006 through July 10, 2006, upon referral by Dr. Wilson in reference to peripheral vascular disease. Plaintiff first presented with complaints of right hip and thigh claudication and lower extremity arterial studies were noted to show evidence of what appeared to be aortoiliac occlusive disease on the right side. Plaintiff's right femoral pulse could not be felt on exam and CT angiogram was recommended. The CT angiogram revealed severe elongate stenosis of the right common iliac artery beginning just below its origin extending to the level of the internal iliac artery origin, as well as mild focal stenosis in the mid left common iliac artery on the left. On July 10, 2006, Plaintiff underwent abdominal aortogram with limited right lower extremity arteriogram and perutaneous balloon expandable stent deployment of the right common iliac artery. The final impression was confirmation of a severe, irregular, elongate stenosis of the entire right common iliac artery with associated flow disturbance into the internal iliac and external iliac systems, with correction of the stenosis using balloon expandable stent (Tr. 408-422).

Dr. Christopher J. Kennedy treated Plaintiff from November 10, 2005 through February 2, 2006, due to his history of inferior wall myocardial infarctions. Problems noted during this time include diabetes mellitus, hyperlipidemia, left arm discomfort, and right-sided weakness (Tr. 423-426).

Plaintiff underwent his second consultative exam by Dr. Konrad on November 21, 2006. Presenting complaints included history of three myocardial infarctions with placement of several stents and an angioplasty, hypertension, insulin-dependent diabetes, and history of stroke with residual right arm restlessness. Physical exam was remarkable for diminished or absent pulses in the lower extremities. The diagnoses were coronary artery disease status post stenting (per patient), diabetes, diminished lower extremity pulses with no history of claudication, and hepatomegaly. Dr. Konrad opined Plaintiff has no impairment related physical limitations whatsoever (Tr. 456-458).

4

On December 7, 2006, a reviewing state agency physician opined Plaintiff can lift/carry a maximum of 20 pounds occasionally, ten pounds frequently; can stand/walk (with normal breaks) for a total of about six hours in an eight-hour workday; can sit (with normal breaks) for a total of about six hours in an eight-hour workday; can never climb ladder/rope/scaffolds; can only occasionally balance, stoop, kneel, crouch, crawl, and/or climb ramp/stairs; should avoid all exposure to hazards (machinery, heights, etc.); and should avoid concentrated exposure to extreme cold and/or extreme heat. In summary, Dr. Misra noted the assessment of Dr. Konrad is not sufficiently restrictive given the totality of the medical evidence of record (Tr. 459-466).

On December 26, 2006, Dr. Kennedy reported that Plaintiff is under the care of his office following two previous myocardial infarctions and a previous stroke (Tr. 467-468).

Plaintiff continued treatment at Twin City Medical Center from June 12, 2006 through November 5, 2007, due to coronary artery disease with history of three heart attacks, diabetes, hyperlipidemia, severe stenosis of the right common iliac artery, right hip avascular necrosis, right groin pain, right thigh pain, weakness in the legs, right shoulder pain, restlessness in the arms, history of brain stem stroke, shortness of breath, fatigue, bilateral hip pain radiating into the right groin area, hypertension, and right arm post-stroke neuropathy (Tr. 469-478, 503-517).

Plaintiff continued treatment by Dr. Scharfstein from July 19, 2006 through October 1, 2007, for follow-up of peripheral vascular disease. During this time, Plaintiff's right groin pain returned; however, it was not felt to be related to arterial insufficiency (Tr. 479-493, 496-502).

Plaintiff returned to Dr. Kennedy on July 11, 2006, for follow-up status post inferior wall myocardial infarctions. The assessment was no recurrence of angina pectoris following recent stent to the right coronary artery, history of restenosis of a previous stented segment, status post CVA followed by Dr. Williams, diabetes mellitus, and hyperlipidemia followed by Dr. Andrews (Tr. 494-495).

Plaintiff returned to Dr. Wilson on January 29, 2007, for follow-up status post left hemisphere cerebral infarction. Plaintiff continued to have problems with his right arm; his memory was not as good as it used to be; and the restless feeling in his arm was keeping him from sleeping at night. The diagnoses were status post left hemisphere cerebral infarction with minimal residual, history of myocardial infarction, diabetes with neuropathy, decreased vision, and arm pain and restlessness at night (Tr. 518-519).

Plaintiff received treatment and testing at Bristol Regional Medical Center on June 17, 2007 and June 21, 2007, due to persistent left hip and leg pain (Tr. 523-542).

Doc. 7, pgs. 2-8.

The ALJ called Dr. Theron Blickenstaff, a "medical expert," to testify at the administrative hearing. Dr. Blickenstaff was asked by the ALJ to "give me your opinion of the situation." Dr. Blickenstaff gave a brief synopsis of plaintiff's cardiovascular problems and their improvement over time. He then opined that plaintiff, because of the taking of

5

insulin, should be restricted from driving vehicles on the job, working at heights, working alone, working with or around hazardous equipment, and from performing rotating shift work. Dr. Blickenstaff further opined that the plaintiff should not lift more than 35 pounds occasionally and 15 pounds frequently. He believed that the plaintiff would have no other limitations "based on credibility of symptoms." (Tr. 42-43).

The ALJ also called Dr. Norman Hankins, a vocational expert. Dr. Hankins was asked if there were jobs for a person of plaintiff's age and educational background who had the physical limitations expressed by Dr. Blickenstaff. Dr. Hankins opined that the jobs of kitchen worker, hand packer, assembler, a partial range stock clerk, assembler, checker, examiner and sorter would be available and that there were 75,000 such positions in Tennessee and up to five million nationwide. He was then asked if there were jobs available for a person with the limitations described in Exhibit 13F. Exhibit 13F is a medical assessment by a State Agency physician of the plaintiff's residual functional capacity which is essentially a reduced range of light work. Dr. Hankins opined that there would be 40,000 jobs in Tennessee and one and a half million in the national economy which such a person could perform.

In his hearing decision, the ALJ found that the plaintiff had the severe impairments of acute myocardial infarction and cardiovascular disease. He found that the plaintiff possessed "the residual functional capacity to perform light work, i.e., lifting and carrying 35 pounds occasionally and 15 pounds frequently; that does not involve driving, that does not involve unprotected heights, that does not involve working alone, that does not involve working around hazards and that does not involve rotating stock work." (Tr. 14). Although

6

the plaintiff could not return to any of his past relevant work, he relied upon the opinion of Dr. Hankins and found that there were 40,000 jobs in the region and over one million in the nation that the plaintiff could perform.[1] Accordingly, he was found to be not disabled. (Tr. 11-19).

Plaintiff first asserts that the ALJ erred in not following the requirements of *Social Security Ruling 96-8p*. That ruling requires the ALJ to consider the various exertional factors which govern the final finding of residual functional capacity, such as sitting, standing, walking, pushing, lifting, etc. The ALJ went to great lengths in his opinion discussing the plaintiff's medical findings and the various medical assessments. Also, the oral assessment of Dr. Blickenstaff at the hearing, and Dr. Konrad's assessment after the plaintiff's second referral to him placed no restrictions on the plaintiff's ability to sit, stand or walk. In fact, Dr. Konrad found no impairment related limitations whatsoever in the second assessment. The ALJ's analysis and findings adequately complied with this ruling.

Plaintiff also argues that the various assessments by the State Agency consultants were more restrictive than Dr. Konrad's assessments and that ultimately found by the ALJ. The job number utilized by the ALJ in his hearing decision was based upon the more restrictive assessment of Dr. Misra (Tr. 459-66). In fact, the ALJ utilized Dr. Blickenstaff's assessment and Dr. Misra's rather than Dr. Konrad's in his questioning of the vocational expert. There was no error in this regard.

---

[1] Although the residual functional capacity found by the ALJ was that offered by Dr. Blickenstaff, he described the lower number of jobs which related to the reduced range of light work opined by the State Agency physician. Since this finding works in the plaintiff's favor, any perceived error is harmless.

Plaintiff also argues that the ALJ's findings do not take into account the opinion of Dr. Wilson, the plaintiff's treating physician, on February 24, 2006, that plaintiff was "unable to function in any gainful employment." (Tr. 388). Indeed, the ALJ mistakenly stated in his hearing decision that "[n]o treating physician has placed any restrictions on the claimant nor indicated that he was totally disabled." (Tr. 17). However, as the Commissioner has pointed out, Dr. Wilson's letter on February 24, 2006, was written only two months after plaintiff was hospitalized for his second heart attack. On January 29, 2007, Dr. Wilson stated that the plaintiff had much better exercise tolerance with his right hip. His exam was unremarkable. The plaintiff's cranial nerves were normal. His heart and chest exams were normal. The plaintiff's extremities were "benign" and he had "no obvious deficit today." With respect to the aftereffects of plaintiff's stroke, Dr. Wilson's impression was "status post left hemisphere cerebral infarction with minimal residual." Dr. Wilson's February, 2006 letter was undoubtedly accurate when it was written, while plaintiff was still in the early stages of recovery from his stroke and ambulating with a cane. But due to Dr. Wilson's own findings a year later, the situation had clearly changed. It was unfortunate that the ALJ stated that no restrictions had been placed upon plaintiff by any of his treating doctors. But with the improvements noted by Dr. Wilson and Dr. Konrad, and the non-examining physicians who examined the records, there was adequate evidence to support the ALJ's findings of the plaintiff's functional capacity and his finding that the plaintiff was not entirely credible.

The plaintiff asserts that the ALJ failed to consider the plaintiff's complaints of fatigue, and did not adequately consider his subjective complaints in general. He asserts that the ALJ failed to follow the requirements of *Social Security Ruling 96-7p*, which says "[i]t

is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" However, the ALJ sets forth many findings based upon objective medical evidence to support his conclusions in this regard. He adequately explained his findings on credibility.

There is substantial evidence to support the ALJ's findings and his questioning of the vocational expert. The rationale in his hearing decision is more than adequate and his ultimate finding of residual functional capacity is more restrictive than this substantial evidence would support. It is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 6] be DENIED and the defendant Commissioner's Motion for Summary Judgment [Doc. 13] be GRANTED.[2]

Respectfully recommended:

s/ Dennis H. Inman
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947-950 (6th Cir. 1981); 28 U.S.C. § 636(b)(1)(B) and (C).

9